**TREEHOUSE LAW, LLP**
Benjamin Heikali (SBN 307466)
Joshua Nassir (SBN 318344)
Ruhandy Glezakos (SBN 307473)
Ammad Bajwa (SBN 358564)
3130 Wilshire Blvd., Suite 555
Santa Monica, CA 90403
Telephone: (310) 751-5948
bheikali@treehouselaw.com
rglezakos@treehouselaw.com
jnassir@treehouselaw.com
abajwa@treehouselaw.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Vincent Yovino, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Linus Technology MergerSub, LLC,<br><br>Defendant. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Vincent Yovino ("Plaintiff"), individually, and on behalf of all others similarly situated, by and through his attorneys, brings this Class Action Complaint against Defendant Linus Technology Mergersub, LLC ("Defendant" or "Linus"), based upon personal knowledge as to himself, and upon information, investigation and belief of his counsel.

## INTRODUCTION

1. This class action seeks to challenge the deceptive packaging, labeling and marketing of DAVID Gold protein bars.

2. Defendant built the DAVID brand on a three-number promise, printed on the front of every wrapper and every carton: "28G PROTEIN | 150 CALORIES | ***0g Sugar***." Defendant repeats the promise everywhere it sells — its homepage leads with "28g protein | 150 calories | ***0g sugar***,"[1] its product pages display "***0g TOTAL SUGARS***,"[2] and its Amazon listings advertise "***0g Sugar.***"[3]

3. The promise of no sugar in the Products is false and misleading. Every DAVID Gold bar (the "Products," as defined below) is sweetened with allulose, a sugar found in figs, raisins, wheat, maple syrup, and molasses, and, chemically, a monosaccharide: a simple sugar with the same molecular formula as fructose.[4]

4. Not only is this false and misleading to reasonable consumers, but federal law also forbids this labeling. As a general matter, a company may not make a false or misleading statement on its labeling. 21 U.S.C. § 343(a)(1). And more specifically, under 21 C.F.R. § 101.13(i)(3), a food may not be labeled with "a

---

[1] https://davidprotein.com/collections/gold

[2] https://davidprotein.com/products/blueberry-pie?selling_plan=2544435367&modals=Product-accordion-itemAZjJBcVVtVE02WnJCU__product_form_accordion_LTQBLh0-ingredients

[3] https://www.amazon.com/dp/B0F8DL6BFB?th=1

[4] Cleveland Clinic Health Essentials, What Is Allulose?, https://health.clevelandclinic.org/what-is-allulose; *see also* https://www.lakanto.com/pages/all-about-allulose-sweetener? ("Allulose is a type of sugar that resembles fructose, which is the sugar that occurs naturally in fruit.").

statement about the amount or percentage of a nutrient" – for example 0g sugar – if the claim is "false or misleading in any respect." The "0g Sugar" claims here are false and misleading. "Sugars" are defined as "the sum of all free mono- and disaccharides (such as glucose, fructose, lactose, and sucrose)." 21 C.F.R. § 101.9(c)(6)(ii). Allulose is a free monosaccharide and therefore a sugar. Claiming your Products contain "0g Sugar" when they contain allulose is therefore false and misleading under the relevant regulations.

5. This is no longer an open question. In *Franco v. Chobani, LLC*, the Seventh Circuit held that allulose is a sugar under the governing federal regulation, that state-law claims enforcing these identical standards are not preempted, and that a "zero sugar" label on a product containing four grams of allulose per serving plausibly deceives reasonable consumers. — F.4th —, 2026 WL 2150193 (7th Cir. July 27, 2026). The FDA itself, appearing as amicus at the court's invitation, answered the question directly: "yes" — allulose is a "sugar" as that term is defined at 21 C.F.R. § 101.9(c)(6)(ii).[5]

6. Defendant's Products include allulose – a sugar – and therefore cannot claim to contain "0g sugar." Defendant has deceived the public and has charged a premium for it. Consumers paid for "0g sugar" and received sugar. They were deprived of the benefit of their bargain: they would not have purchased the Products, or would have paid substantially less for them, had they known the truth. As such, Plaintiff and Class members have been financially injured.

7. Plaintiff brings this action on behalf of himself and Classes of consumers in California and other states with materially similar consumer protection laws to recover damages and to enjoin Linus' unlawful conduct.

---

[5] Brief for the United States as Amicus Curiae at 2, 24, *Franco v. Chobani, LLC*, No. 25-2087 (7th Cir. June 29, 2026).

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), also known as the Class Action Fairness Act ("CAFA"). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed Classes are citizens of states different from Defendant.

9. This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts with California, and otherwise intentionally avails itself of the markets within California, through its sale of goods and products (including the Products) in California and to California consumers.

10. Venue is proper in this judicial District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiff resides in this District, purchased the Product in this District, and relied on Defendant's challenged representations in this District.

11. Pursuant to Civil Local Rule 3-2(c) and (d), this action is properly assigned to the San Francisco Division or the Oakland Division of this District because a substantial part of the events giving rise to Plaintiff's claims occurred in Contra Costa County, California, where Plaintiff resides and purchased the Products.

## PLAINTIFF

12. Plaintiff Vincent Yovino is a citizen of California and currently resides in Discovery Bay, California. In early to mid 2026, Plaintiff purchased the David Blueberry Pie Product from a WinCo Foods store in Brentwood, California, for personal consumption. Before purchasing the Product, Plaintiff saw the front-label representation "0g Sugar." Based on this labeling, Plaintiff reasonably believed that the Product contained no sugar. Had Plaintiff known that the Product contained sugar, he would not have purchased the Product, or would have paid significantly less for it. As such, Plaintiff has been directly financially injured as a direct result of Defendant's misleading labeling.

13. Plaintiff would purchase the Products again. Plaintiff enjoys the Products and continues to seek protein bars that contain no sugar. Plaintiff would buy the Products in the future if he could trust that the "0g Sugar" representation is accurate. But Plaintiff cannot rely on that representation. Defendant has reformulated the Products at least once while continuing to label them "0g Sugar." Plaintiff has no insight into Defendant's formulation practices, which can change at any time without notice. Absent an injunction, Plaintiff will either be misled again or be forced to forgo purchasing Products he would otherwise buy. Plaintiff therefore faces a real and imminent threat of continuing and future harm.

## DEFENDANT

14. Defendant Linus Technology Mergersub, LLC is a Delaware limited liability company that does business under the trade name "David Protein." Upon information and belief, Linus maintains its principal place of business at 169 Madison Avenue, Suite 2523, New York, New York 10016. Linus is the registered owner of the "DAVID PROTEIN" trademark (Serial No. 98268169) and manufactures, formulates, labels, advertises, markets, distributes, and sells the Products in California and throughout the United States.

15. At all relevant times, Linus, through its agents, employees, and corporate affiliates, has been responsible for the formulation, labeling, advertising, marketing, distribution, and sale of the Products. Linus ratified and benefited from the conduct alleged in this Complaint.

## FACTUAL ALLEGATIONS

### I. Defendant's "0g Sugar" Representations.

16. Defendant launched the DAVID bar on September 16, 2024, and built the brand on a three-number promise: 28 grams of protein, 150 calories, and ***0g sugar***.[6]

17. This action concerns Defendant's DAVID Gold protein bars — in all flavors, sizes, counts, and pack configurations (the "Products," as further identified in Exhibit A).[7]

18. The front of every wrapper and every carton prominently displays ***"0g Sugar"*** alongside "28G Protein" and "150 Calories." On Defendant's minimalist packaging, these three claims are the central design elements of the label. *See* below and on the following page for representative photographs of the Products' packaging (emphasis added).







[6] https://www.prnewswire.com/news-releases/introducing-david-a-rigorously-perfected-protein-bar-302249150.html
[7]Shop Gold | 28g protein, 150 calories, 0g Sugar, https://davidprotein.com/collections/gold (last visited Aug. 18, 2026) ("Every David Gold bar delivers the same macros: 28g of protein, 150 calories, and 0g of sugar. Eight flavors.").


David™
Fudge Brownie
Flavored Bar
28g Protein | 150 Calories | 0g Sugar


David™
Salted
Peanut Butter
Flavored Bar
28g Protein | 150 Calories | 0g Sugar


28g Protein
150 Calories
0g Sugar
Chocolate Chip
Cookie Dough
Flavored Bar
David™
The most effective portable protein on Earth.
Chocolate Chip
Cookie Dough
Flavored Bar
0g Sugar
4 - 2.19 oz (62g) Bars
*NOT ACTUAL SIZE
Net Wt 8.75 oz (248g)

19. Defendant repeats the promise at every digital point of sale it controls. Its homepage leads with "28g protein. 150 calories. 0g sugar."[8] As a consumer hovers their mouse over a product image, a pop up appears stating "0g Sugar."[9] Its product pages display a nutrition banner reading "0g TOTAL SUGARS."[10] Its product page promises that "[e]very David Gold bar delivers the same macros: 28g of protein, 150 calories, and 0g of sugar." *See* images below (emphasis added).







[8] David Protein, https://davidprotein.com/ (last visited Aug. 18, 2026).

[9] *Id.*

[10] *See, e.g.,* Fudge Brownie High Protein Bar, https://davidprotein.com/products/fudge-brownie; Peanut Butter Chocolate Chunk High Protein Bar, https://davidprotein.com/products/peanut-butter-chocolate-chunk (each last visited Aug. 18, 2026).







20. Defendant makes the representation even when consumers ask about sugar directly. Defendant's own website answers questions about the Products' sugar content by affirming: "David Gold bars contain 0g of sugar per bar. They are sweetened with sucralose and acesulfame potassium, which contribute no calories and do not affect blood sugar the way traditional sugars do."[11] *See* image below (emphasis added).




[11] Shop Gold, https://davidprotein.com/collections/gold (last visited Aug. 18, 2026).

21. Defendant's official retail listings carry the same message. Its Amazon listings are titled "0g Sugar" and advertise: "Finding protein bars high protein with 0g of sugar can be tough, but David bars check both boxes. With 0g of sugar and low net carbs, they keep things simple." *See* images below (emphasis added).[12]




[12] https://www.amazon.com/dp/B0DJWJ632V?th=1

22. Defendant even wields sugar content as a competitive weapon. Its homepage publishes a comparison chart scoring rival bars by their grams of sugar: "David Gold bars contain 150 calories, 0g sugar, 28g protein," while "Built Puff bars contain . . . 6-8g sugar," Barebells bars "1-2g sugar," and Quest bars "1g sugar."[13]




23. The statements described above, together with all materially identical "0g Sugar," "0g of Sugar," and "0g Total Sugars" statements on the Products' packaging, labeling, and/or in Defendant's advertising and retail listings, are collectively referred to herein as the "Representations." The Representations are uniform: every purchaser of every Product was exposed to a materially identical 0g sugar claim.

24. Defendant has made the Representations continuously, from the Products' September 2024 launch through the present.

25. Consumers pay a premium for the promise. Defendant extracts that premium on the strength of its advertised macronutrient profile, with the "0g Sugar" claim at its center.

26. In truth, every Product is sweetened with allulose — a sugar. Defendant told consumers the opposite, at scale, at a premium. Selling consumers a food product

---

[13]David Protein, https://davidprotein.com/ (last visited Aug. 18, 2026).

that is intentionally mislabeled and intended to deceive them violates a number of laws, as further alleged below.

## II. Allulose Is a Sugar.

27. Allulose is a sugar.

28. It is a naturally occurring sugar in foods such as figs, raisins, maple syrup, and brown sugar.[14]

29. Chemically, allulose (also called D-psicose) is a free monosaccharide — a simple sugar.[15] It is the C-3 epimer of D-fructose: allulose has the identical molecular formula ($C_6H_{12}O_6$) as fructose and glucose, and the identical arrangement of bonded atoms as fructose; the two molecules differ only in the three-dimensional




(a) (b)

Chemical structures of (a) D-allulose, (b) D-fructose

[14]Cleveland Clinic Health Essentials, What Is Allulose?, https://health.clevelandclinic.org/what-is-allulose; *see also* https://www.lakanto.com/pages/all-about-allulose-sweetener? ("Allulose is a type of sugar that resembles fructose, which is the sugar that occurs naturally in fruit.").

[15]Han-Joo Maeng et al., Metabolic Stability of D-Allulose in Biorelevant Media and Hepatocytes: Comparison with Fructose and Erythritol, 8 Foods art. 448 (2019), https://doi.org/10.3390/foods8100448 ("D-allulose, a C-3 epimer of D-fructose, is a rare monosaccharide used as a food ingredient or a sweetener.").

orientation of a single hydroxyl group at the third carbon. A side-by-side illustration is below:

30. The FDA describes allulose the same way: "Allulose or D-psicose (D-ribo-2-hexulose) is a monosaccharide with a molecular formula of C6H12O6, and is an epimer of D-fructose."[16] As a monosaccharide, allulose falls squarely within the FDA's codified definition of sugar. 21 C.F.R. § 101.9(c)(6)(ii) (defining sugars as "the sum of ***all*** free mono- and disaccharides").

31. The FDA is not alone in recognizing that allulose is a sugar. Tate & Lyle — the ingredient manufacturer responsible for most commercial-grade allulose — has acknowledged in multiple FDA filings that "Allulose is a monosaccharide and is classified as a sugar."[17] The Calorie Control Council — the sweetener industry's own trade association — describes allulose under the heading "Allulose is a Naturally Occurring Sugar," explaining that "[a] monosaccharide, or simple sugar, allulose is absorbed by the body, but not metabolized."[18]

32. Allulose is not merely a sugar as a matter of chemical classification; it is used as one. Because allulose has only approximately 70% of sucrose's sweetness, it cannot do its job in the trace quantities typical of high-intensity sweeteners such as sucralose, aspartame, and acesulfame potassium, which are 200 to 20,000 times as sweet as sucrose. Allulose must instead be used in larger scale quantities as a bulk

[16] FDA, The Declaration of Allulose and Calories from Allulose on Nutrition and Supplement Facts Labels: Guidance for Industry 2 (Oct. 2020), available at https://www.fda.gov/media/123342/download

[17] https://downloads.regulations.gov/FDA-2015-P-1201-0001/attachment_1.pdf; *see also* https://www.regulations.gov/document/FDA-2015-P-1201-0014.

[18] Calorie Control Council, Allulose, https://caloriecontrol.org/ingredients/sweeteners/allulose/

sweetener — which is precisely why manufacturers often add multiple grams of it to each serving.[19]

33. Allulose also behaves like sugar in food: its solubility, water activity, and viscosity are similar to fructose, and it is "widely regarded as a promising substitute for sucrose" — that is, a substitute for table sugar that is itself a sugar.[20]

34. A DAVID bar sweetened with allulose is really just a protein bar sweetened with sugar; its "0g Sugar" label is a lie.

**III. Each Product Contains Allulose.**

35. Allulose appears in the ingredient statement of every Product, in both formulas Defendant has sold. The current Fudge Brownie ingredients list is representative: "Protein system (milk protein isolate, collagen, whey protein concentrate, egg white), binding system (maltitol, ***allulose***, glycerin, soluble corn fiber, tapioca starch, soy lecithin), fat system (modified plant fat [EPG], coconut oil), flavor system (dutch process cocoa powder, unsweetened chocolate, natural and artificial flavor, salt, sucralose, acesulfame potassium)."[21]

36. From the Products launch on September 16, 2024 until approximately February 2025, each Product contained seven grams of allulose per bar. Industry press covering the launch reported the original formula's complete carbohydrate

[19]Maeng et al., supra note 2, at 2, 9–10; Youngji Han et al., Gastrointestinal Tolerance of D-Allulose in Healthy and Young Adults, 10 Nutrients art. 2010, at 1–2 (2018), https://doi.org/10.3390/nu10122010 (allulose "maintains approximately 70% of sweetness relative to sugar"); Mengting Tao, Wenli Zhang & Wanmeng Mu, d-Allulose: A New Generation of Potential Bulk Sweeteners in the Food Industry, 73 J. Agric. & Food Chem. 27,833 (2025).

[20]Han et al., supra note 6, at 10 ("It is convenient for the food industry to use D-allulose, as its chemical properties are similar to those of fructose in terms of solubility, water activity, and viscosity."); Wenli Zhang et al., D-Allulose, a Versatile Rare Sugar: Recent Biotechnological Advances and Challenges, 63 Critical Revs. Food Sci. & Nutrition 5661 (2023).

[21]Fudge Brownie High Protein Bar, https://davidprotein.com/products/fudge-brownie (last visited Aug. 18, 2026);

accounting: of the bar's 14 grams of total carbohydrate, "2g of dietary fiber, 3g of glycerin to help with the bar's texture, and 7g of the sugar substitute allulose" — leaving 2 grams of net carbohydrates. On information and belief, that breakdown reflected nutrition information Defendant itself supplied.[22]

37. In or around February 2025, Defendant reformulated the Products, maltitol replaced allulose as the first-listed ingredient of the "binding system," and allulose moved to second within it. Defendant no longer discloses the amount of allulose in the Products.[23]

38. Defendant's own label nonetheless establishes that each Product contains a significant amount of allulose.

39. Start with the rule: federal law requires ingredients to be listed in descending order of predominance by weight, so an ingredient listed earlier in an ingredient statement outweighs every ingredient listed after it. 21 C.F.R. § 101.4(a)(1). In the Products' "binding system," allulose is listed ahead of glycerin, soluble corn fiber, and tapioca starch. By Defendant's own ordering, the Products contain more allulose, by weight, than any of those ingredients.

40. The ordering is no accident; it reflects allulose's job in the bar. Defendant itself describes allulose as a core structural and sweetening ingredient — "Allulose provides binding as well as sweetness" — while "Glycerin, Tapioca Starch, and Soy

[22]Stack3d, How Does David Protein Bar's Nutrition Work Out to 150 Calories (Oct. 9, 2024), https://www.stack3d.com/2024/10/calorie-breakdown-of-david-protein-bar/ (reporting Defendant's published breakdown: "the carbohydrates break down to 2g of dietary fiber, 3g of glycerin to help with the bar's texture, and 7g of the sugar substitute allulose").

[23] Stack3d (Feb. 2025) https://www.stack3d.com/2025/02/refined-david-protein-bar/ (reporting Defendant's move "to a binding system now primarily using maltitol instead of allulose," while "the nutrition profile has remained intact").

Lecithin are used in smaller quantities."[24] Defendant likewise admits that "[m]altitol and allulose, part of the bar's binding system, also add sweetness."[25]

41. Under both formulas—original and current—every Product Defendant has ever sold has been sweetened with allulose (a sugar).

42. Despite the foregoing, the Products' ingredients lists do not reveal — and Defendant nowhere discloses — that allulose is a sugar. "Allulose" is not a household word. A shopper who noticed the unfamiliar term and wondered whether it might be sugar would be answered by the front of the same package: 0g Sugar. The label does not merely hide that the Products' sweetener is sugar — it affirmatively *teaches* consumers that it is not.

## IV. Federal Law Prohibits Defendant's "0g Sugar" Claims; the Products Are Misbranded.

43. Congress empowered the FDA to oversee and regulate food labeling by enacting the Food, Drug, and Cosmetic Act, as amended by the Nutrition Labeling and Education Act. 21 U.S.C. § 301, *et seq.* The FDA's implementing regulations are codified at 21 C.F.R. Part 101.

44. Those regulations draw a sharp distinction between two types of food label statements: (i) declarations made within the Nutrition Facts panel, *see, e.g.*, 21 C.F.R. § 101.9; and (ii) "nutrient content claims" — statements that "expressly or implicitly characterize[] the level of a nutrient" such as sugar — made anywhere else on the label or in labeling, 21 C.F.R. § 101.13(b).

45. None of Plaintiff's claims relates to or depends on any declaration made within the Nutrition Facts panel of the Products. At issue in this case are the separate,

[24]David Protein, That Was Us, https://davidprotein.com/pages/thatwasus; accord David Protein Bar Sample Pack, Amazon.com, https://www.amazon.com/dp/B0DJWHVRZX (each last visited Aug. 18, 2026).

[25]David Protein, Frequently Asked Questions, *supra* note 4.

deceptive nutrient content claims that Defendant has placed on the front of its packaging and repeated throughout its marketing.

*a.* *The "0g Sugar" Violate 21 C.F.R. § 101.13.*

46. Defendant's "0g Sugar" statements are "expressed nutrient content claims" defined as "any direct statement about the level (or range) of a nutrient in the food, e.g., 'low sodium' or 'contains 100 calories.'" 21 C.F.R. § 101.13(b)(1). A gram figure is the regulation's own example of such a statement. *See Hawkins*, 906 F.3d at 770 (holding that the front-label statement "0g Trans Fat per serving" is "an expressed nutrient content claim that the product does not contain trans fat").

47. Expressed nutrient content claims, such as "0g Sugar", are permitted outside the Nutrition Facts panel only if, among other things, they are "not false or misleading in any respect." 21 C.F.R. § 101.13(i).

48. Defendant's "0g Sugar" statements are false and misleading. The regulations require the amount of sugar to be measured by the definition of "sugars" in 21 C.F.R. § 101.9(c)(6)(ii). which defines "Total Sugars" as "the sum of all free mono- and disaccharides (such as glucose, fructose, lactose, and sucrose)." *See id.* § 101.13(b) (a nutrient content claim characterizes a "nutrient of the type required to be in nutrition labeling under § 101.9"); *id.* § 101.13(o) (compliance with nutrient content claim requirements is "determined using the analytical methodology prescribed for determining compliance with nutrition labeling in § 101.9").

49. Allulose is a sugar under that definition, and the FDA has said so from the start. When it adopted the definition in 1993, the FDA expressly rejected comments urging it to define "sugars" by "physiological characteristics" "rather than the number of saccharide units," 58 Fed. Reg. 2,079, 2,098, 2,177 (Jan. 6, 1993), and in its 2016 Nutrition Facts rulemaking it stated that allulose, "as a monosaccharide, must be included" in the Total Sugars declaration "pending any future rulemaking that would otherwise exclude" it. 81 Fed. Reg. 33,742, 33,795–96 (May 27, 2016).

50. Most recently, in *Franco v. Chobani, LLC* — a class action challenging "zero sugar" yogurt sweetened with allulose — the Seventh Circuit resolved the question. The court invited the FDA to address "whether allulose is a 'sugar' as that term is defined at 21 C.F.R. § 101.9(c)(6)(ii)." The FDA's answer was "yes." [26] The Seventh Circuit agreed, holding that the governing regulations are "plain" and that "sugars include every monosaccharide, including allulose." *Franco v. Chobani, LLC*, — F.4th —, 2026 WL 2150193, at *5 (7th Cir. July 27, 2026). Because the consumers sought to hold the manufacturer liable under state law for violating identical standards, their claims were not preempted. *Id.*

51. Measured that way, the amount of sugars in each Product is not zero grams. Each Product is sweetened with allulose, a sugar under 21 C.F.R. § 101.9(c)(6)(ii)). No disclaimer of any kind accompanies the statements. A "0g Sugar" claim on a product sweetened with sugar is false; at minimum, it is misleading, because it tells consumers the Products contain no sugar when they are, in fact sweetened with sugar. A food whose "labeling is false or misleading in any particular" is misbranded, independent of any other provision. 21 U.S.C. § 343(a)(1).

52. Separately, the Products are misbranded under 21 U.S.C. § 343(r)(1)(A): their labels bear nutrient content claims that are not made in accordance with the regulations authorizing such claims, as alleged above. Misbranded food may not lawfully be introduced or delivered for introduction into interstate commerce. 21 U.S.C. § 331(a).

53. Plaintiff does not sue to enforce the FDCA. As outlined below in Section VI , Plaintiff sues to enforce independently enforceable California law that imposes requirements identical to the federal requirements. Because Plaintiff's state-law claims are based on the exact same deceptive nutrient content claims that render the

[26] Brief for the United States as Amicus Curiae at 2, 24, *Franco v. Chobani, LLC*, No. 25-2087 (7th Cir. June 29, 2026).

Products misbranded under federal law, there is no conflict between the two regimes and no FDCA preemption of any kind. 21 U.S.C. § 343-1(a)(5).

**V. Defendant's Conduct Violates California's Sherman Law.**

54. California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875, *et seq.* (the "Sherman Law"), adopts the federal food-labeling regulations as the law of California: "All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state." *Id.* § 110100(a); *see also id.* § 110670. Every requirement of § 101.13 described above — measured, as those provisions require, by the definition of "sugars" in § 101.9(c)(6)(ii) —is therefore California law, and each of Defendant's violations of those federal requirements is equally a violation of California law.

55. Defendant's manufacturing, marketing, advertising, distribution, and sale of the Products violate the Sherman Law's misbranding provisions, including: Section 110660 (a food is misbranded if its labeling is false or misleading in any particular); Section 110670 (a food is misbranded if its label does not conform to the nutrient-content-claim requirements of 21 U.S.C. § 343(r)); Section 110760 (unlawful to manufacture, sell, deliver, hold, or offer for sale any misbranded food); Section 110765 (unlawful to misbrand any food); and Section 110770 (unlawful to receive in commerce any misbranded food or to deliver it).

56. Defendant's conduct likewise violates the Sherman Law's false-advertising provisions, including: Section 109885; Section 110390 (unlawful to disseminate any false advertisement of any food, where an advertisement is false "if it is false or misleading in any particular"); Section 110395 (unlawful to advertise any misbranded food); Section 110398 (unlawful to advertise any food in violation of Chapter 4 of the Sherman Law); and Section 110400 (unlawful to receive in commerce any food that is falsely advertised or to deliver it).

57. These Sherman Law violations are independently unlawful under California law and serve as predicate violations under California's Unfair Competition Law, as further alleged below.

## VI. Reasonable Consumers Are Deceived — and Cannot Discover the Truth.

58. The Representations communicate one thing to reasonable consumers: the Products contain no sugar. That is the plain and ordinary meaning of "0g Sugar." A reasonable interpretation of a label stating that a food has "0g sugar" is that the labeled food actually has zero grams of sugar.

59. "0g Sugar" is an absolute, objective, quantitative claim about a measurable physical attribute of the Products. It is a statement of fact — not puffery, not opinion, and not ambiguous.

60. Inspecting the ingredient list or other information presented by Defendant would not alert consumers to the truth, because Defendant nowhere discloses that allulose is a sugar. Moreover, allulose is not a common household name; in a 2021 marketing survey, only 15% of respondents had even heard of allulose — let alone knew that it was a sugar.[27]

61. Defendant also actively concealed the material fact that allulose is a sugar, and affirmatively told consumers the opposite, assuring them on its own website and in its product listings that allulose is "[u]nlike sugar."[28]

62. The practical consequence of Defendant's labeling choices is that a consumer standing in the store — reading the front of the pack, the back of the pack, the ingredient statement, and even Defendant's website — encounters nothing, anywhere, revealing that the Products contain sugar. The deception cannot be discovered at the point of sale.

---

[27] International Food Information Council, Perceptions and Use of Dietary Sweeteners (May 2021), https://foodinsight.org/wp-content/uploads/2021/05/IFIC-Sweeteners-Survey.May-2021.pdf.

[28] https://www.amazon.com/dp/B0DJWHVRZX?lv=shuf&channelId=500&plpRedirect=mhFallback

## VII. The "0g Sugar" Representations Are Material — Consumers Seek Out, and Pay More for, Products Without Sugar.

63. The presence and amount of sugar in a food is material to reasonable consumers: it is information a reasonable person would attach importance to in deciding whether, and at what price, to purchase the Products.

64. Consumer demand for products without sugar is overwhelming and well documented. A 2022 nationwide survey found that 73% of Americans ages 18 to 80 reported trying to limit or avoid sugars in their diet.[29]

65. That demand accords with uniform public-health guidance. The World Health Organization recommends limiting free sugars to less than 10 percent of total daily energy intake — and states that limiting them to 5 percent or less would provide additional health benefits. The American Heart Association recommends limiting added sugars to no more than 6 percent of daily calories.[30]

66. Consumption of allulose can also have gastrointestinal effects such as nausea, bloating, diarrhea, and abdominal pain.[31] A large clinical trial on the gastrointestinal tolerance of allulose determined that, compared to traditional cane sugar, consumption of allulose resulted in "significantly higher frequencies of symptoms of diarrhea, abdominal distention, and abdominal pain." Increasing the

[29] International Food Information Council, 2022 Food & Health Survey 57 (May 18, 2022), https://ific.org/wp-content/uploads/2022/06/IFIC-2022-Food-and-Health-Survey-Report-May2022.pdf.

[30] World Health Organization, Healthy Diet, https://www.who.int/news-room/fact-sheets/detail/healthy-diet; American Heart Association, Added Sugars, https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/sugar/added-sugars.

[31] Memorandum from Center for Science in the Public Interest to Food and Drug Administration (June 17, 2019), https://cspinet.org/sites/default/files/attachment/allulose%20final%20from%20CSPI.pdf.

level of ingested allulose "resulted in incidences of severe nausea, abdominal pain, headache, anorexia, and diarrheal symptoms."[32]

67. A consumer deciding whether to eat a bar sweetened with allulose is therefore deciding something that has direct health effects on their body. The Representations denied consumers that choice.

68. Food manufacturers are acutely aware of this demand and of the premium consumers will pay to satisfy it. Products labeled "sugar free" and "no sugar" command higher prices than comparable products without those claims, and manufacturers reserve the front principal display panel for the claims they believe will most motivate a purchase. Trading on consumers' well-known desire for sugar free products is a deliberate marketing strategy designed to capitalize on healthy-eating trends.

69. Defendant is explicit about this. Asked on its own website "[w]hy are your bars more expensive than other bars," Defendant answers that its bars "deliver exceptional value to our customers by offering 150 calories, 20-28g of highly digestible protein, and 0g sugar."[33] In Defendant's own words, the Products command a premium price, and "0g sugar" is part of the justification for it.

70. Indeed, Defendant's conduct shows it knows the "0g Sugar" claim commands a price premium. Defendant prints "0g Sugar" on the front of every wrapper, leads its homepage with it, titles its Amazon listings with it, and publishes a comparison chart scoring its competitors by their grams of sugar. *Supra* ¶¶ 18–24. Companies do not build their brand identity around a claim consumers ignore.

---

[32]Han Y, Choi BR, Kim SY, Kim SB, Kim YH, Kwon EY & Choi MS, Gastrointestinal Tolerance of D-Allulose in Healthy and Young Adults: A Non-Randomized Controlled Trial, 10 Nutrients 2010 (2018), https://doi.org/10.3390/nu10122010.

[33] David Frequently Asked Questions, No. 08, David, https://davidprotein.com/pages/frequently-asked-questions (last visited Aug. 21, 2026).

## VIII. Defendant Knew the Representations Were False and Misleading

71. At all relevant times, Defendant's misrepresentations were knowing and intentional. Defendant knew or reasonably should have known that: (a) it was putting allulose in the Products. Launch-era trade coverage reported that each bar contained seven grams of allulose, and, upon information and belief, Defendant supplied that figure; (b) allulose is a sugar — a fact repeatedly confirmed by the FDA; (c) its labels and advertising represented that the Products contained no sugar; (d) reasonable consumers would view, assume to be true, and rely upon the Representations in making purchasing decisions; (e) consumers relying on the Representations would not receive the benefit of their bargain; and (f) the Representations enabled Defendant to charge consumers a premium for Products that are actually sweetened with sugar.

72. Defendant is a sophisticated actor. Its founders are veteran food-industry operators — its Chief Executive Officer co-founded RXBAR and sold it to Kellogg for hundreds of millions, and Defendant holds itself out as an exemplar of scientific rigor, advertising that its Products are "third-party tested" for content and purity. A sophisticated food company is charged with knowledge of the labeling rules that govern the products it sells and the ingredients it selects.

73. Every source of that knowledge predated the Products' launch. The FDA's definition of sugars has included all monosaccharides since 1993.

74. Defendant's command of allulose's chemistry was, and is, granular. At launch, trade coverage reported the number to the gram: seven grams of allulose per bar. Upon information and belief, Defendant supplied that figure, even as it printed "0G SUGAR" on the same package. Defendant understands exactly what allulose is; the only classification it has never disclosed to consumers is the one that matters — allulose is a monosaccharide, a sugar. And since reformulating in February 2025, Defendant has disclosed no allulose figure at all, while keeping the "0g Sugar" claim.

75. As of August 24, 2026, Defendant continues to manufacture, market, and sell the Products bearing the same "0g Sugar" Representations on its packaging, its

website, and its retail listings. Defendant's conduct is knowing, willful, and continuing.

76. This deception was carried out with the intent that Plaintiff and consumers would rely on the Representations, and it was carried out to enrich Defendant by boosting sales of the Products through deceptive means.

**IX. Plaintiff and the Class Lack an Adequate Remedy at Law.**

77. Plaintiff seeks damages and, in the alternative, restitution and other equitable relief. Plaintiff lacks an adequate remedy at law because legal damages may not fully compensate Plaintiff and the Classes for the deception, and calculating the precise economic loss (e.g., the exact price premium attributable to the misleading claim) may be difficult or uncertain. Restitution, which focuses on restoring the benefits unjustly obtained by Defendant, provides a more certain and direct equitable remedy for the harm caused by Defendant's deceptive practices, particularly where consumers purchased products they would not have bought at all but for the misrepresentation. Furthermore, injunctive relief is necessary to prevent future harm, which monetary damages alone cannot achieve.

78. Equitable relief under the UCL and FAL is additionally appropriate because those statutes provide relief that no legal claim can: the UCL's unlawful prong borrows statutory prohibitions — including the Sherman Law — that do not themselves afford a private right of action, and restitution under the UCL and FAL is measured by the amounts Defendant unjustly obtained from the Classes, a measure distinct from, and potentially broader than, the damages available at law.

## CLASS ACTION ALLEGATIONS

79. Plaintiff brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3), on

behalf of himself and the members of the following proposed multi-state class ("Multi-State Consumer Protection Class"):[34]

> During the fullest period allowed by law, all persons who purchased the Product in the state of California or any state with similar laws, [35] within the applicable statue of limitations for personal use and not resale until the date notice is disseminated.

80. Plaintiff further brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) on behalf of himself and the members of the following class ("California Class"):

> During the fullest period allowed by law, all persons who purchased the Products in the State of California, within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.

---

[34] Unless otherwise specified, all references in this Complaint to "Classes" or the "Class" refer collectively to the Multi-State Consumer Protection Class and California.

[35] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: Alaska (AS §§ 45.50.471, *et seq.*), Arkansas (Ark. Code §§ 4-88-101, *et seq.*), California (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), Connecticut (Conn. Gen. Stat. §§ 42-110, *et seq*), Delaware (Del. Code tit. 6, §§ 2511, *et seq.*), District of Columbia (D.C. Code §§ 28-3901, *et seq.*), Florida (Fla. Stat. §§ 501.201, *et seq.*), Hawaii (Haw. Rev. Stat. §§ 480-1, *et seq.*), Illinois (815 ICLS §§ 501/1, *et seq.*), Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*), Michigan (Mich. Comp. Law §§ 445.901, *et seq.*), Minnesota (Minn. Stat. §§ 325F.67, *et seq.*), Missouri (Mo. Rev. Stat. §§ 407.010, *et seq.*), New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*), New York (N.Y. Gen. Bus. Law. §§ 349, *et seq.* and §§ 350, *et seq.*), Rhode Island (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*), Vermont (Vt. Stat. tit. 9, §§ 2451, *et seq.*), Washington (Wash. Rev. Code §§ 19.86.010, *et seq.*), and Wisconsin (Wis. Stat. §§ 100.18, *et seq.*). *See Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 96 (2d Cir. 2018); *Mancuso v. RFA Brands, LLC*, 454 F. Supp. 3d 197, 201, 204 (W.D.N.Y. 2020); *see also Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, *9-10 (N.D. Ill. Nov. 16, 2021) (certifying a similar multi-state consumer protection class).

81. Members of the Multi-State Consumer Protection Class and California Class are referred to collectively as the "Class members." Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiff reserves the right to amend the Class definition, as necessary.

82. Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or add subclasses before the Court determines whether class certification is appropriate.

83. Plaintiff is a member of all the Classes.

84. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence that individual Class members would use to prove those elements in individual actions alleging the same claims.

85. **Numerosity:** Members of each Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class members is unknown to Plaintiff but is likely to be ascertained by Defendant's and other retailers' records. At a minimum, there are likely tens of thousands of Class members.

86. **Commonality:** There are questions of law and fact common to the proposed Classes. Common questions of law and fact include, without limitations:

a. whether allulose is a sugar;

b. whether reasonable consumers were deceived by Defendant's labeling and advertising;

c. whether Defendant's course of conduct violates the statutes, regulations, and other laws pleaded in this Complaint;

d. whether Defendant was unjustly enriched by retaining monies from the sale of the Products;

e. whether certification of each Class is appropriate under Rule 23;

f. whether Plaintiff and Class Members are entitled to declaratory, equitable, or injunctive relief, and the scope of such relief; and

g. the amount and nature of the relief to be awarded to Plaintiff and the Classes, including whether Plaintiff and the Classes are entitled to punitive damages.

87. **Typicality:** Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff, like Class Members, purchased one or more of the Products in reliance on Defendant's uniform "0g Sugar" claim. Plaintiff and Class Members would not have purchased the Products, or would have paid significantly less for them, had Defendant's labeling complied with federal and state law.

88. **Adequacy:** Plaintiff will fairly and adequately protect the interests of the proposed Classes. Plaintiff's interests do not conflict with the interests of the Class Members he seeks to represent, and Plaintiff has retained counsel competent and experienced in consumer class action litigation. The interests of the Class Members will therefore be fairly and adequately protected by Plaintiff and his counsel.

89. **Predominance:** Pursuant to Rule 23(b)(3), the common issues of law and fact identified in this Complaint predominate over any other questions affecting only individual members of the Classes. Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's misconduct detailed at length in this Complaint.

90. **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of hundreds of thousands of individual claims in separate lawsuits, every one of which

would present the issues presented in the Complaint/lawsuit. Further, because of the damages suffered by any individual Class member may be relatively modest in relation to the cost of litigation, the expense and burden of individual litigation make it difficult, if not impossible. Furthermore, many of the Class members may be unaware that claims exist against the Defendant.

91. **Declaratory and Injunctive Relief:** Pursuant to Rule 23(b)(2), declaratory and injunctive relief is appropriate in this matter. Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole. Unless a class-wide injunction is issued, Defendant will continue to advertise, market, promote, and sell the Products in an unlawful and misleading manner, as described throughout this Complaint, and members of the Classes will continue to be misled, harmed, and denied their rights under the law.

## FIRST CLAIM FOR RELIEF

**Violation of State Consumer Protection Statutes**

**(*By Plaintiff, Individually, and on Behalf of the Multi-State Consumer Protection Class*)**

92. Plaintiff individually and on behalf of the Multi-State Consumer Protection Class, repeats and realleges paragraphs 1 through 90 as if fully set forth herein.

93. Plaintiff and the Multi-State Consumer Protection Class members were injured as a result of Defendant's violations of state consumer protection statutes. These state consumer protection statutes provide a basis for redress to Plaintiff and the Multi-State Consumer Protection Class based on Defendant's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

94. Defendant's conduct, as alleged herein, violates the consumer protection, unfair trade practices, and deceptive laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

95. Defendant's marketing of the Products violates these prohibitions by deceiving consumers into believing that the Products contain no sugar, when in fact the Products are sweetened with allulose — a sugar.

96. Defendant engaged in fraudulent and/or deceptive conduct which creates the likelihood of confusion or misunderstanding in violation of applicable law.

97. Defendant chose to package, label and market the Products in this way to impact consumer choices, extract price premiums and gain market dominance, as it is aware that all reasonable consumers who purchase the Products would be impacted by, and would reasonably believe, its false and misleading representations.

98. Defendant intended for Plaintiff and Multi-State Consumer Protection Class members to reasonably rely upon the material misrepresentations concerning the true nature of the Products.

99. Defendant's misrepresentations and other deceptive conduct were likely to deceive and cause misunderstanding and/or, in fact, did cause Plaintiff and Multi-State Consumer Protection Class members to be deceived about the true nature of the Products.

100. As a direct and proximate result of Defendant's misrepresentations, Plaintiff and Multi-State Consumer Protection Class members suffered ascertainable losses.

101. Had they been aware of the true nature of the Products, Plaintiff and Multi-State Consumer Protection Class members either would have paid less for the Products or would not have made the purchases at all.

102. Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Protection Class members are entitled to recover compensatory, restitution, punitive and special damages, including, but not

limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted by relevant law.

## <u>SECOND CLAIM FOR RELIEF</u>
**Unjust Enrichment / Quasi-Contract**
**(*By Plaintiff, Individually, and on Behalf of the California Class*)**

103. Plaintiff, individually and on behalf of the California Class repeats and realleges paragraphs 1 through 90 as if fully set forth herein.

104. As set forth in this Complaint, Defendant's unfair and unlawful conduct includes, among other things, making materially false and misleading representations about the sugar content of its Products. Defendant's acts and business practices offend the established public policy of California and of the other states encompassing the California Class, as well as federal law, and there is no public benefit that comes from such false labeling and advertising—only harm.

105. While Plaintiff and Class members were harmed at the time of purchase, Defendant was unjustly enriched by its misrepresentations. As a result of Defendant's unlawful, unfair and fraudulent business practices, Plaintiff and Class members suffered injury.

106. To Defendant's benefit and enrichment, it knowingly realized substantial revenue from selling the Products at the expense of, and to the detriment of, Plaintiff and Class members. Defendant's retention of these benefits violates fundamental principles of justice, equity and good conscience.

107. Plaintiff and the Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Product, which is not as Defendant represents.

108. Under common law principles of unjust enrichment and quasi-contract, it is inequitable for Defendant to retain the benefits conferred by Plaintiff's and Class members' overpayments.

109. As such, Plaintiff and Class members seek disgorgement of all profits resulting from such overpayments and the establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

## THIRD CLAIM FOR RELIEF

**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, et seq.**
**(*By Plaintiff, Individually, and on Behalf of the California Class*)**
**(*for injunctive relief only*)**

110. Plaintiff individually and on behalf of the California Class, realleges paragraphs 1 through 90 as if fully set forth herein.

111. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendant pursuant to California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq*.

112. The Products are "good[s]" within the meaning of Cal. Civ. Code § 1761(a), and the purchases of the Products by Plaintiff and members of the California Class constitute "transactions" within the meaning of Cal. Civ. Code § 1761(e).

113. Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have[.]" By representing that the Products contain "0g Sugar," Defendant has represented and continues to represent that the Products have characteristics and ingredients that they do not have — namely, that the Products contain no sugar — when in fact the Products are sweetened with allulose, a sugar. Therefore, Defendant has violated and continues to violate section 1770(a)(5) of the CLRA.

114. Cal. Civ. Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." By making "0g Sugar" representations when marketing and advertising the Products, Defendant has represented and continues to

represent that the Products are of a particular standard — containing no sugar — when they are of another, because the Products are sweetened with allulose, a sugar. Therefore, Defendant has violated and continues to violate section 1770(a)(7) of the CLRA.

115. Cal. Civ. Code § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." By marketing and advertising the Products as containing no sugar, and not delivering Products as such, Defendant has advertised the Products with characteristics it intended not to provide to consumers. As such, Defendant has violated and continues to violate section 1770(a)(9) of the CLRA.

116. At all relevant times, Defendant has known or reasonably should have known that the marketing and advertising of its Products with "0g Sugar" representations are false and misleading, and that Plaintiff and other members of the California Class would reasonably and justifiably rely on these representations when purchasing the Products. Nonetheless, Defendant deceptively advertises the Products as such in order to deceive consumers into believing they contain no sugar.

117. Plaintiff and members of the California Class have justifiably relied on Defendant's misleading representations when purchasing the Products. Moreover, based on the materiality of Defendant's misleading and deceptive conduct, reliance may be presumed or inferred for Plaintiff and members of the California Class.

118. Plaintiff and members of the California Class have suffered and continue to suffer injuries caused by Defendant because they would have paid significantly less for the Products, or would not have purchased them at all, had they known that the Products contain sugar.

119. Pursuant to Cal. Civ. Code § 1782, on August 24, 2026, Plaintiff notified Defendant in writing by certified mail of its violations of § 1770 described above and demanded that it rectify its conduct on a class-wide basis. If Defendant fails to provide, or agree to provide, the requested remedies within 30 days of its receipt of that notice, Plaintiff will amend this Complaint without leave of court, pursuant to

Civil Code § 1782(d), to seek actual, statutory, and punitive damages under the CLRA.

120. Pursuant to Cal. Civ. Code § 1780(d), a declaration of venue is attached to this Complaint.

**FOURTH CLAIM FOR RELIEF**
**Violation of California's Unfair Competition Law ("UCL")**
**California Business & Professions Code § 17200, *et seq*.**
**(*By Plaintiff, Individually, and on Behalf of the California Class*)**

121. Plaintiff individually and on behalf of the California Class, realleges paragraphs 1 through 90 as if fully set forth herein.

122. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendant pursuant to California Business & Professions Code § 17200, *et seq*.

123. The UCL, Cal. Bus. & Prof. Code § 17200, provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising[.]"

124. Under the UCL, a business act or practice is "unlawful" if it violates any established state or federal law. Defendant's false and misleading advertising of the Products was and continues to be "unlawful" because it violates the CLRA; the FAL; California's Sherman Food, Drug, and Cosmetic Law, including Cal. Health & Safety Code §§ 110100, 110390, 110395, 110398, 110400, 110660, 110670, 110760, 110765, and 110770; and the federal food labeling requirements adopted by the Sherman Law, including 21 U.S.C. § 343(a)(1) and (r)(1)(A) and 21 C.F.R. §§ 101.13 and 101.9(c)(6)(ii), as described herein. As a result of Defendant's unlawful business acts and practices, Defendant has unlawfully obtained money from Plaintiff and members of the proposed California Class.

125. Under the UCL, a business act or practice is "unfair" if its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical,

oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims.

126. Defendant's conduct was and continues to be of no benefit to purchasers of the Products, as it is misleading, unfair, unlawful, and is injurious to consumers who rely on the marketing and advertising. Therefore, Defendant's conduct was and continues to be "unfair." As a result of Defendant's unfair business acts and practices, Defendant has and continues to unfairly obtain money from Plaintiff and members of the proposed California Class.

127. Under the UCL, a business act or practice is "fraudulent" if it actually deceives or is likely to deceive members of the consuming public.

128. Defendant's conduct here was and continues to be fraudulent because, due to the Products' "0g Sugar" representations, it has the effect of deceiving consumers into believing the Products contain no sugar, when in fact the Products are sweetened with allulose, a sugar. Because Defendant misled Plaintiff and members of the California Class, Defendant's conduct was "fraudulent." As a result of Defendant's fraudulent business acts and practices, Defendant has and continues to fraudulently obtain money from Plaintiff and members of the California Class.

129. Plaintiff requests that the Court cause Defendant to restore this unlawfully, unfairly, and fraudulently obtained money to him, and members of the proposed California Class, to disgorge the profits Defendant made on these transactions, and to enjoin Defendant from violating the UCL or violating it in the same fashion in the future as discussed herein. Otherwise, Plaintiff and members of the proposed California Class may be irreparably harmed and/or denied an effective and complete remedy.

## FIFTH CLAIM FOR RELIEF

**Violation of California's False Advertising Law ("FAL")**
**California Business & Professions Code § 17500, *et seq.***
**(*By Plaintiff, Individually, and on Behalf of the California Class*)**

130. Plaintiff individually and on behalf of the California Class, realleges paragraphs 1 through 90 as if fully set forth herein.

131. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendant pursuant to California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq*.

132. The FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

133. Defendant has violated the FAL by disseminating uniform, unqualified representations on the Products' front labels, packaging, and advertising that the Products contain "0g Sugar." Under the reasonable consumer test, these statements are likely to deceive members of the public into believing that the Products contain no sugar.

134. Defendant's front-label, website, and retail-listing representations — including the prominent "0g Sugar" statement repeated on every package — are likely to deceive reasonable consumers into believing that the Products contain no sugar.

135. These challenged representations are unambiguously deceptive because they contain no asterisks, qualifying language, or clarifying disclosures informing consumers that the Products in fact contain sugar.

136. Defendant knew, or by the exercise of reasonable care should have

known, that these representations were untrue and misleading because Defendant formulated, marketed, labeled, and sold the Products sweetened with allulose, a sugar, while simultaneously representing that the Products contain "0g Sugar."

137. Plaintiff and the California Class have standing to bring this claim because they lost money or property as a result of Defendant's FAL violations. Specifically, they relied on Defendant's false advertising and paid a premium price for Products they believed contained no sugar and that they otherwise would not have purchased, or would have purchased only at a lower price, had the truth been disclosed.

138. Defendant has represented and continues to represent to the public, including Plaintiff and members of the proposed California Class, through its deceptive marketing and advertising, that the Products are of a particular standard and contain no sugar, when that is not true. Because Defendant has disseminated misleading information regarding the Products, and Defendant knows, knew, or should have known through the exercise of reasonable care that the representations were and continue to be misleading, Defendant has violated the FAL.

139. As a direct result of Defendant's false advertising, Defendant has obtained, and continues to obtain, unlawful money at the expense of Plaintiff and the California Class. Plaintiff therefore requests that the Court: (a) enjoin Defendant from continuing these deceptive practices; (b) order the restitution of all money fraudulently obtained; and (c) order the disgorgement of profits earned through these transactions.

140. Plaintiff and the California Class will be irreparably harmed without an injunction, as Defendant continues to sell the Products using deceptive labels that prevent Plaintiff from making informed purchasing decisions in the future.

**<u>SIXTH CLAIM FOR RELIEF</u>**
**Intentional Misrepresentation / Fraud**
**(*By Plaintiff, Individually, and on Behalf of the California Class*)**

141. Plaintiff individually and on behalf of the California Class, realleges paragraphs 1 through 90 as if fully set forth herein.

142. As alleged herein, Defendant made representations of material fact to Plaintiff and Class members concerning the sugar content of the Products, specifically the "0g Sugar" representations.

143. These representations were false and misleading. Defendant knew these representations were false and misleading when made, or made them with reckless disregard for their truth, because Defendant formulated the Products, selected allulose as a sweetening ingredient, and knew that allulose is a monosaccharide — a fact Defendant's own marketing materials acknowledge in describing allulose as a "non digestible carbohydrate."

144. Defendant also actively concealed the material fact that allulose is a sugar, and affirmatively told consumers the opposite — assuring them in its own product listings that allulose is "[u]nlike sugar" and that the Products contain "0g Sugar."[36]

145. Defendant made these false representations and concealed material facts with the intent to defraud and induce Plaintiff and Class members to purchase the Products.

146. Plaintiff and Class members reasonably relied on Defendant's false representations and concealment when purchasing the Products.

147. As a direct and proximate result of Defendant's intentional misrepresentations and fraudulent concealment, Plaintiff and Class members suffered damages, including economic losses from purchasing the Products under false

[36] https://www.amazon.com/dp/B0DJWHVRZX?lv=shuf&channelId=500&plpRedirect=mhFallback

pretenses regarding their sugar content. Defendant's conduct was malicious, oppressive, or fraudulent, warranting an award of damages, including punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed Classes, respectfully prays for following relief:

A. Certification of this case as a class action on behalf of the proposed Classes defined above, appointment of Plaintiff as Class representative, and appointment of his counsel as Class Counsel;

B. An order enjoining Defendant from continuing to label, advertise, or market the Products with "0g Sugar" or any other sugar content claim so long as the Products contain sugar as defined by federal and California law, and requiring corrective disclosures;

C. An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendant's conduct;

D. An award of nominal, punitive, and statutory damages;

E. An award to Plaintiff and his counsel of reasonable expenses and attorneys' fees;

F. An award to Plaintiff and the proposed Classes of pre and post-judgment interest, to the extent allowable; and

G. For such further relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually, and on behalf of the proposed Classes, hereby demands a jury trial with respect to all issues triable of right by jury.

DATED: August 24, 2026 **TREEHOUSE LAW, LLP**

By: *<u>/s/ Benjamin Heikali</u>*

Benjamin Heikali (SBN 307466)
Ruhandy Glezakos (SBN 307473)
Joshua Nassir (SBN 318344)
Ammad Bajwa (SBN 358564)
3130 Wilshire Blvd., Suite 555
Santa Monica, CA 90403
Telephone: (310) 751-5948
bheikali@treehouselaw.com
rglezakos@treehouselaw.com
jnassir@treehouselaw.com
abajwa@treehouselaw.com

*Attorneys for Plaintiff and the Putative Classes*

**<u>Venue Declaration Pursuant to Cal. Civ. Code 1780(d)</u>**

I, Vincent Yovino, declare as follows:

1. I am the named Plaintiff in the above-captioned action and a citizen of the State of California. I have personal knowledge of the facts set forth in this declaration, and am competent to testify to the same. The matters set forth herein are true and correct to the best of my knowledge and belief.

2. I believe that the Northern District of California is the proper place for trial of this case because I reside in and purchased the challenged Products in this district.

I declare under penalty of perjury that the foregoing is true and correct, executed on 08/21/2026 in Discovery Bay, California.

Vincent Yovino

The signed document can be validated at https://app.vinesign.com/Verify